**TOM PETRUS & MILLER LLLC**

RICHARD B. MILLER        3729-0
Tel (808) 792-5855
rmiller@tpm-hawaii.com
DAVID R. HARADA-STONE    6229-0
Tel (808) 792-5800
dharada-stone@tpm-hawaii.com
Finance Factors Center
1164 Bishop Street, Suite 650
Honolulu, Hawaii 96813
Facsimile: (808) 792-5809

Attorneys for Plaintiff
AMERICAN CONTRACTORS INSURANCE
 COMPANY RISK RETENTION GROUP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| AMERICAN CONTRACTORS INSURANCE COMPANY RISK RETENTION GROUP,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>IEA RENEWABLE ENERGY, INC., f/k/a RMT, INC.; and ALLIANT ENERGY CORPORATION,<br><br>　　　　Defendants. | CIVIL NO. CV _____<br>(Declaratory Judgment)<br><br>COMPLAINT FOR DECLARATORY JUDGMENT; SUMMONS |

## COMPLAINT FOR DECLARATORY JUDGMENT

Comes now Plaintiff AMERICAN CONTRACTORS INSURANCE COMPANY RISK RETENTION GROUP ("ACIG"), by and through its counsel, Tom Petrus & Miller, LLLC, and for its complaint against the above-named defendants alleges and avers as follows:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff ACIG is a Texas corporation with its principal place of business in Richardson, Texas.

2. Upon information and belief, Defendant IEA Renewable Energy, Inc., fka RMT, INC. ("RMT") is a Wisconsin corporation with its principal place of business in Madison, Wisconsin.

3. Upon information and belief, Defendant ALLIANT ENERGY CORPORATION ("Alliant") is a Wisconsin corporation with its principal place of business in Madison, Wisconsin.

4. There is complete diversity of citizenship between the parties, and the amount in controversy herein exceeds $75,000.

5. ACIG brings this action pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 2201 asking this court to determine, as a matter of law, that ACIG has no duty to indemnify the Defendants for the claims asserted against them in an underlying arbitration proceeding (the "Arbitration") in which the claimant, Kawailoa Wind,

LLC ("Kawailoa Wind"), alleged defects in work performed by RMT on a wind energy project in Haleiwa, Oahu (the "Project").

6. There is an actual and continuing controversy between ACIG and Defendants as to whether the commercial general liability ("CGL") insurance policies issued by ACIG to Goodfellow Brothers Inc. ("GBI") provide additional insured coverage for the settlement of the Arbitration by the Defendants.

7. All or a substantial portion of the events giving rise to this action occurred within the City and County of Honolulu and the State of Hawaii.

8. Venue lies in this court pursuant to 28 U.S.C. § 1391.

## THE UNDERLYING CLAIM

9. On or about November 13, 2015, Kawailoa Wind filed a Demand for Arbitration with the American Arbitration Association naming RMT and Alliant as Respondents. On June 14, 2016, Kawailoa Wind submitted its Summary of Claims, supplementing the information provided in its Demand for Arbitration.

10. GBI performed construction work on the Project as a subcontractor of RMT, but was not named as a Respondent in the Arbitration. In addition, unlike RMT's engineering and design subcontractor, Earth Systems Global, Inc. ("ESGI"), GBI is not mentioned in the Demand for Arbitration or Statement of Claims.

11. In the Arbitration, Kawailoa Wind alleged that it had entered into a

Balance of Plant Construction Contract dated February 8, 2012 with RMT (the "Contract"), as design-builder, to design and construct the Project.

12. According to Kawailoa Wind, RMT's work under the Contract included the design, structural analysis and installation of the foundations for the wind turbines on the Project.

13. Also according to Kawailoa Wind, RMT hired the engineering firm of Earth Systems Global, Inc. ("ESGI") to design the turbine foundations and/or provide engineering and design services related to the design of the turbine foundations.

14. Kawailoa Wind further alleged that on or about February 15, 2012, it and Alliant executed a "Parent Company Guaranty" by which Alliant irrevocably and unconditionally guaranteed to Kawailoa Wind the "due and full performance" by RMT of all of its obligations and liabilities under and in accordance with RMT's Contract with Kawailoa Wind.

15. According to Kawailoa Wind, RMT claimed to have substantially completed its work on the Project in or about October 2012.

16. Kawailoa Wind alleged that starting in late November 2012, after the turbines began operating, RMT personnel observed cracking and grout separation in and around the visible parts of the concrete portions of several turbine foundations, along with visible movement of the foundations.

17. Kawailoa Wind alleged it sent a "Notice of Warranty Claim" to RMT on February 1, 2013.

18. According to Kawailoa Wind, surveys by RMT's engineering consultant, Barr Engineering, between March and August of 2013, established that several foundations had already reached their maximum rotational tolerances for the full 20-year life of the turbines, even though the turbines had been in service less than a year.

19. Kawailoa Wind alleged that RMT failed to promptly investigate the foundation failures and conduct a root cause analysis ("RCA") and that when it finally did arrange for a RCA, it used ESGI to lead and manage the study. According to Kawailoa Wind, this presented an "obvious conflict of interest" because "the relevant circumstances strongly suggested that ESGI was responsible for the ongoing foundation failures."

20. According to Kawailoa Wind, only after repeated demands from Kawailoa Wind did RMT finally engage a third-party engineering firm, HDR, to perform an independent RCA.

21. According to Kawailoa Wind, HDR completed its RCA on or about May 30, 2014, concluding that the foundations designed by ESGI did not meet the Contract specifications and were defective and that ESGI had committed errors and omissions in its geotechnical analysis for the Project.

22. Kawailoa Wind alleged that despite these findings, RMT had failed to implement corrective measures as of the date of the filing of Kawailoa Wind's Demand for Arbitration, more than two-and-a-half years after Kawailoa first made a warranty claim.

23. Kawailoa Wind alleged breaches of contract and warranty, negligence and gross negligence by RMT, including but not limited to:

   a. RMT's failure to perform geotechnical and soil analysis to support the Turbine Foundation Work in accordance with Contract specifications or Good Industry Standards, as defined by the Contract;

   b. RMT's failure to design, construct and install Turbine foundations or to otherwise complete the Turbine Foundation Work in accordance with Contract specifications or in accordance with Good Industry Standards;

   c. RMT's failure to timely or properly remedy or repair the foundation defects as required by its warranty obligations under the Contract;

   d. RMT's negligence and gross negligence in designing, constructing and installing defective foundations, and in responding to the foundation defects, including by continually denying responsibility for properly correcting the defects, entrusting its subcontractor, ESGI, to manage and lead the root cause analysis, and taking no action to mitigate substantial operational and financial risks in the face of rapidly deteriorating conditions;

   e. RMT's common law obligations to indemnify Kawailoa Wind.

   f. RMT's contractual obligations to indemnify Kawailoa Wind.

   g. Any applicable claims in equity.

24. Kawailoa Wind alleged that Alliant is equally liable as RMT's guarantor.

6

## THE INSURANCE POLICIES

### The CGL Policy

25. ACIG issued a Commercial General Liability policy No. GL12000036 (the "CGL Policy") to Goodfellow Bros. Inc. ("GBI") as named insured, with a relevant policy period of June 1, 2012 to June 1, 2013.

26. The Declarations for the Primary Policy show a General Aggregate Limit of $500,000, a Products - Completed Operations Aggregate Limit of $500,000, and an Each Occurrence Limit of $500,000.

27. GBI and RMT entered into a subcontract for construction of the turbine foundations for the Project.

28. Under the terms of its subcontract, GBI was required to name RMT as an additional insured on its CGL Policy.

29. The CGL Policy is subject to the following Additional Insured – Owners, Lessees or Contractors Endorsement (the "Additional Insured Endorsement"):

### ADDITIONAL INSURED — OWNERS, LESSEES OR CONTRACTORS

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART
Name of Person or Organization:
Any person or organization that you have agreed to and/or are required by contract to name as an additional insured.

7

It is hereby understood and agreed WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of "your work" for that insured by or for you.

With respect to these additional insureds, this insurance does not apply to "bodily injury," "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services, including:

(1) The preparing, approving or failure to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

(2) Supervisory, inspection or engineering services.

This endorsement shall not apply to a person or organization if any other additional insured endorsement attached to this policy specifically applies to that person or organization.

The insurance afforded herein only applies to the extent permitted by applicable state law, including statutes governing additional insured coverage in the construction industry.

WHERE SPECIFICALLY REQUIRED BY CONTRACT, IT IS FURTHER UNDERSTOOD AND AGREED THAT THE INSURANCE PROVIDED BY THIS ENDORSEMENT IS PRIMARY. OTHER INSURANCE THE ADDITIONAL INSURED PURCHASES ON ITS OWN BEHALF SHALL APPLY AS EXCESS OF, AND DOES NOT CONTRIBUTE, WITH THE INSURANCE PROVIDED BY THIS ENDORSEMENT. HOWEVER, THIS INSURANCE IS ALWAYS EXCESS TO OTHER APPLICABLE INSURANCE, WHETHER PRIMARY, EXCESS, CONTINGENT OR ON ANY OTHER BASIS, WHEN THE ADDITIONAL INSURED HAS BEEN ADDED TO THE OTHER INSURANCE AS AN ADDITIONAL INSURED.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the mentioned Policy, other than as above stated.

30. The CGL Policy provides that "the words 'you' and 'your' refer to the Named Insured shown in the Declarations," i.e., GBI.

31. The CGL Policy further defines "your work," in relevant part, as follows:

> "Your work" means:
> a. Work or operations performed by you or on your behalf; and
> b. Materials, parts or equipment furnished in connection with such work or operations.
>
> "Your work" includes:
> a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and
> b. The providing of or failure to provide warnings or instructions.

32. The CGL Policy is further subject to the following Amended Limits of Liability Endorsement:

> **AMENDED LIMITS OF LIABILITY**
>
> This endorsement modifies insurance provided under the following:
>
> Only in the event a written contract requires this policy to provide primary policy limits greater than those provided by this policy, the limits of liability of this policy will be increased to meet those contract requirements. Under no circumstances will the limit of this policy be increased to more than $2,000,000 per occurrence, $4,000,000 aggregate and $4,000,000 products-completed operations aggregate, $2,000,000 personal and advertising injury, $2,000,000 employee benefits aggregate, $2,000,000 employee benefits per employee, $1,000,000 stop-gap employers liability bodily injury by accident - each accident, $1,000,000 stop-gap employers liability bodily injury by disease – aggregate and $1,000,000 stop-gap employers liability bodily injury by disease - each employee.
>
> Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the mentioned Policy, other than as above stated.

33. The CGL Policy includes the following insuring language:

    1. Insuring Agreement

        a. We will pay those sums, including punitive damages unless prohibited by law, that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS -- COVERAGES A AND B. This insurance applies only to "bodily injury" and "property damage" which occurs during the policy period. The "bodily injury" or "property damage" must be caused by an "occurrence."

34. The CGL Policy also includes the following relevant definitions:

    7. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

        a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

        b. You have failed to fulfill the terms of a contract or agreement;

    if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work"; or your fulfilling the terms of the contract or agreement.

. . . .

    12. "Occurrence" means:

        a. An accident, including continuous or repeated exposure to substantially the same general harmful condition; or

    b.    An act or omission, including all related acts or omissions, that causes "property damage" to "your work."

. . . .

16.    "Property damage" means:

    a.    Physical injury to tangible property, including all resulting loss of use of that property. All such loss shall be deemed to occur at the time of the physical injury that caused it.

    b.    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

35.    The CGL Policy also includes the following relevant exclusions:

    b.    "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

        (1)    that the insured would have in the absence of the contract or agreement[.]

. . . .

    k.    "Property damage" to "impaired property" or property that has not been physically injured, arising out of:

        (1)    A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

        (2)    A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

36.    The CGL Policy further includes the following relevant conditions:

    4.    Duties In The Event of "Occurrence", Offense, Claim or "Suit"

        . . . .

    c.    You and any other involved insured and additional insured must:

        (1)    Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

        (2)    Authorize us to obtain records and other information;

        (3)    Cooperate with us fully in the investigation, settlement or defense of the claim or "suit"; and make all records, photographs, video and employees available for assistance in our investigation.

        (4)    Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

. . . .

    f.    No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

. . . .

13.    Transfer of Rights of Recovery Against Others To Us
If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

. . . .

## The Excess Policy

37.    ACIG issued a Following Form Excess Liability Policy No. GL

12

12X00036 ("the Excess Policy") to GBI as named insured, with a relevant policy period of June 1, 2012 to June 1, 2013.

38. The Declarations for the Excess Policy show a General Aggregate Limit of $3,500,000, a Products - Completed Operations Aggregate Limit of $3,500,000, and an Each Occurrence Limit of $1,500,000.

39. The Underlying Insurance Schedule for the Excess Policy identifies the CGL Policy as the Controlling Underlying Policy and the limits specified in the Declarations for the CGL Policy as the underlying limits, i.e., $500,000 per occurrence and $500,000 aggregate.

40. The Excess Policy defines "insured" as follows:

The word "insured" means any person or organization qualifying as such in the Controlling Underlying Policy, but only to the extent and within the scope for which such "insureds" qualify for coverage in the Controlling Underlying Policy.

41. The Excess Policy includes the following relevant insuring language:

SECTION I. COVERAGE

A. We will pay on behalf of the insured the sums in excess of the total Underlying Limits of Insurance shown in Item 3. of the Declarations that the insured becomes legally obligated to pay as damages.

B. This insurance applies only to damages covered by the Controlling Underlying Policy as shown in Item 3. of the Declarations. Except as otherwise provided by this policy, the coverage follows the definitions, terms, conditions, limitations, and exclusions of the Controlling Underlying Policy in effect at the inception of this policy.

    C.    The amount we will pay for damages is limited as described in SECTION II. LIMITS OF INSURANCE.

    42.    The Excess Policy includes the following relevant Limits of Insurance provisions:

> SECTION II – LIMITS OF INSURANCE
>
> A.    The Limits of Insurance shown in the Declarations and the rules below describe the most we will pay regardless of the number of:
>
>     1.    Insureds;
>
>     2.    Claims made or suits brought;
>
>     3.    Persons or organizations making claims or bringing suits.
>
> B.    The Limits of Insurance of this policy will apply as follows:
>
>     1.    This policy applies only in excess of the Underlying Limits of Insurance shown in Item 3. of the Declarations.
>
>     2.    If our Limits of Insurance stated in Item 1. of the Declarations are less than the total Limits of Insurance stated in Item 1., the limits of our liability shall be that proportion of all damages which our Limits of Insurance bear to the total Limits of Insurance in Item 1. and which is in excess of the total Underlying Insurance Limits as stated in Item 3. of the Declarations.
>
>     3.    Subject to Paragraph B.2. above, the Occurrence Limit stated in Item 1.A. of the Declarations is the most we will pay for all damages arising out of any one occurrence to which this policy applies.
>
>     4.    Subject to Paragraph B.2. and B.3. above, the limit stated in Item 1.C. of the Declarations for the Products/Completed Operations Aggregate is the most we will pay for all damages during our policy period under the products/completed operations hazard.

43. The Excess Policy also includes the following Amended Limits of Liability Endorsement:

> Only in the event a written contract requires the underlying commercial general liability policy set out in the Schedule to provide primary policy limits greater than those provided in that policy, the limit of this policy will be decreased to the extent of the increase in the primary policy limits and this policy shall provide limits in excess thereof. Under no circumstances will the limit of this policy be increased to provide more than a total combined limit between the primary policy and this policy in excess of $2,000,000 per occurrence, $4,000,000 aggregate, $4,000,000 products-completed operations aggregate, $2,000,000 personal and advertising injury, $2,000,000 employee benefits aggregate, $2,000,000 employee benefits per employee, $1,000,000 stop-gap employers liability bodily injury by accident - each accident, $1,000,000 stop-gap employers liability bodily injury by disease – aggregate and $1,000,000 stop-gap employers liability bodily injury by disease - each employee.
>
> Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the mentioned Policy, other than as above stated.

## TENDER AND DEFENSE

44. On or about December 7, 2015, RMT tendered defense of Kawailoa Wind's arbitration demand to ACIG under the CGL Policy.

45. By letter dated January 13, 2016, ACIG acknowledged RMT's tender and agreed to provide RMT with a defense pursuant to a reservation of rights.

46. ACIG entered into a Joint Defense and Cost Sharing Agreement with Zurich American Insurance Company ("Zurich"), CGL insurer for RMT, effective March 25, 2016.

15

47. ACIG, Zurich, RMT and Alliant entered into a Defense and Non-Waiver Agreement, effective March 25, 2016, whereby RMT was allowed to select its counsel to defend it against Kawailoa Wind's claims.

### RMT'S SETTLEMENT WITH ESGI

48. On or about February 3, 2017, counsel for RMT requested that Zurich participate in a phone conference on February 6, 2017 regarding the pending arbitration of Kawailoa Wind's claims. Counsel for Zurich advised ACIG of the call, and ACIG participated.

49. During the February 6, 2017 call, counsel for RMT advised ACIG and Zurich for the first time that RMT intended to release ESGI from any and all liability for any claims arising out of or relating to the Arbitration in exchange for ESGI's cooperation in the Arbitration.

50. Counsel for ACIG and Zurich expressed concern about releasing ESGI, and ACIG advised RMT and its counsel that ACIG would need more time to evaluate the proposed strategy.

51. By email dated February 7, 2017, counsel for RMT advised counsel for ACIG and Zurich that it was "working on" addressing ACIG's questions regarding the value of ESGI's cooperation.

52. By email dated February 8, 2017, counsel for RMT provided more details on why RMT believed the cooperation and expertise of ESGI personnel

would be helpful in the pending mediation, while at the same time acknowledging Kawailoa Wind intended to emphasize the allegedly flawed design and analysis of the foundation type provided by ESGI.

53. The next day, on February 9, 2017, counsel for RMT advised Zurich and ACIG that RMT and Alliant had executed a settlement agreement with ESGI, without further opportunity for ACIG to object or provide its consent.

### MEDIATION, SETTLEMENT AND DEMAND

54. In or about March 2017, RMT, Alliant and Kawailoa Wind engaged in a mediation.

55. Counsel for RMT advised counsel for Zurich and ACIG that RMT and Alliant did not see a need for the carriers to be represented at the mediation.

56. As a result of the mediation, RMT and Alliant entered into a settlement agreement with Kawailoa Wind.

57. Neither RMT, Alliant, nor their counsel conferred with ACIG regarding the settlement or any demands, offers or negotiations related thereto.

58. By letter dated April 20, 2017, counsel for RMT and Alliant formally advised ACIG of the settlement and its amount, informed ACIG that Alliant's professional liability carrier, Steadfast Insurance Company, had agreed to indemnify RMT and Alliant up to the liability limit of its policy, and tendered the remaining settlement amount to ACIG under the CGL Policy, up to the ACIG

policies' limit.

## CLAIM FOR DECLARATORY JUDGMENT

59. ACIG realleges and incorporates herein by reference the allegations in Paragraphs 1 – 58 of this Complaint.

60. There is no coverage available to Defendants for the settlement of Kawailoa Wind's claims because Defendants' liability does not arise out of GBI's work, as is required for coverage under the ACIG CGL Policy's Additional Insured Endorsement.

61. There is no coverage available to Defendants for the settlement of Kawailoa Wind's claims because coverage is excluded under the professional services exclusion contained in the Additional Insured Endorsement.

62. There is no coverage available to Defendants for the settlement of Kawailoa Wind's claims because some or all of the claims are not for "property damage" as defined in the CGL Policy and thus are not covered under the ACIG policies.

63. There is no coverage available to Defendants for the settlement of Kawailoa Wind's claims because coverage for some or all of the claims is precluded by the CGL Policy's exclusion for property damage for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.

64. There is no coverage available to Defendants for the settlement of Kawailoa Wind's claims because coverage for some or all of the claims is precluded by the CGL Policy's exclusion for property damage to "impaired property" or property that has not been physically injured.

65. The CGL Policy provides that "[n]o insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." RMT and Alliant did not seek or obtain ACIG's consent to their settlement with Kawailoa Wind. Accordingly, ACIG has no obligation to indemnify RMT and Alliant for any obligation assumed by them under the settlement agreement.

66. The CGL Policy provides for the transfer of any rights an insured may have to recover all or part of any payment by ACIG and requires that the insured do nothing after a loss to impair ACIG's right of recover. RMT and Alliant's release of ESGI, without ACIG's consent, has materially impaired and prejudiced ACIG's subrogation rights, thus relieving ACIG of any obligations it might otherwise have under its policies.

WHEREFORE, ACIG prays for relief as follows:

A. For a binding declaration that ACIG has no duty to indemnify Defendants for the claims asserted against them by Kawailoa Wind.

B.  For ACIG's attorney's fees and cost of suit in this action and for such other relief as the Court may deem appropriate under the circumstances.

DATED: Honolulu, Hawaii, _____ MAY 1 7 2017 _____.

_____
RICHARD B. MILLER
DAVID R. HARADA-STONE

Attorneys for Plaintiff
AMERICAN CONTRACTORS
INSURANCE COMPANY RISK RETENTION
GROUP